**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

DARRELL J. YOUNG,
EMERALD McNEIL,

        Plaintiffs,

-vs-                                    Case No. 6:04-cv-1830-Orl-31KRS

SEMINOLE COUNTY SHERIFF DONALD
F. ESLINGER, and DEPUTY SHERIFF
OFFICERS CHARLES B. FAGAN,
WYTOSIA WILEY, JEFFREY WILBUR,
RAY BRONSON, & JEFF DUNCAN

        Defendants.

## ORDER

This matter comes before the Court on the Defendants' Motion to Partially Exclude Testimony of Plaintiffs' Expert Melvin L. Tucker (Doc. 58) and the Plaintiffs' response (Doc. 60).

**I.    Background**

The Plaintiffs, individually and as the guardians of Da'Mond Young, a minor, contend that their civil rights were violated during an August 2001 traffic stop conducted by members of the Seminole County Sheriff's Office. (Doc. 38 at 5). They have filed a seven-count complaint alleging false arrest/imprisonment against Defendant Sheriff Donald F. Eslinger ("Eslinger" or "the Sheriff") (Count I); violation of right to privacy against the Sheriff (Count II);[1] invasion of privacy against the Sheriff (Count III); invasion of privacy against Defendant Deputy Sheriff

---

[1] Count II was dismissed with prejudice on March 9, 2005. (Doc. 30). Although the Plaintiffs included it in their Amended Complaint, which was filed after that dismissal, they stated that they were not attempting to reallege that claim. (Doc. 38 at 9 n.1).

Charles B. Fagan ("Fagan") and Defendant Deputy Sheriff Jeffrey Wilbur ("Wilbur") (Count IV); intentional infliction of emotional distress against Fagan, Wilbur, and Defendant Deputy Sheriff Wytosia Wiley ("Wiley") (Count V); violation of 42 U.S.C. § 1983 against the Sheriff (Count VI); and violation of 42 U.S.C. § 1983 against Fagan, Wilbur, Defendant Deputy Sheriff Ray Bronson ("Bronson"), and Defendant Deputy Sheriff Jeff Duncan ("Duncan"). (Doc. 38). Melvin L. Tucker ("Tucker"), a retired police chief and FBI agent, has been retained by the Plaintiffs to offer an expert opinion regarding the police practices at issue in the instant case. (Doc. 58-2).

## II.     Standards

### A.     *Daubert*

In *Daubert v. Merrill Dow*, 509 U.S. 579 (1993), the Supreme Court admonished trial courts to fulfill a gatekeeping role in the presentation of expert testimony. Federal Rule of Evidence 702 ("Rule 702") provides that:

> If scientific . . . knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

From the reference to "scientific knowledge" and the condition that it "will assist the trier of fact," the Supreme Court, in *Daubert*, interpreted Rule 702 to require that expert testimony on scientific matters have the following inter-connected attributes:

- that it be "scientific," having a "grounding in the methods and procedures of science";
- that it bear the hallmarks of "knowledge," which "connotes more than subjective belief or unsupported speculation"; and
- that it "assist the trier of fact" or "fit" a matter at issue, meaning that it expresses scientific knowledge as to the proposition for which it is offered.

*Daubert*, 509 U.S. 579, 592 (1993).  Expert testimony need not purport to reveal a known certainty, but it must be derived by the "scientific method," which requires that it be supported by appropriate validation based on what is known.  *Id.*

As explained in *Daubert* and subsequent case law, courts have a gatekeeping function under Rule 702 to determine whether an assertion, which purports to be scientific, is sufficiently reliable that it may form a sound basis for knowledge of a relevant historical fact.  Courts are to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *Id.* at 592-93.  Evidentiary reliability is the focus of this inquiry.  "The proponent of the expert testimony carries a substantial burden under Rule 702. The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." *Cook v. Sheriff of Monroe County, Florida*, 402 F.3d 1092, 1107 (11th Cir. 2005) (internal citation and quotation omitted).

### B.   Municipal liability under Section 1983

Municipal liability under Section 1983 cannot be based solely on the theory of *respondeat superior*.  *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994).  To establish municipal liability in a Section 1983 case, plaintiffs must show that action pursuant to official municipal policy of some nature caused a constitutional tort.  *Id.*  Only those municipal officers who have final policymaking authority may by their actions subject the government to Section 1983 liability.  *Id.*  Liability will also attach for constitutional deprivations visited pursuant to governmental custom even though such a custom has not received formal approval through the

municipality's official decisionmaking channels. *Id.* at 1342-43. Although not authorized by written law, such practices of state officials can be so permanent and well settled as to constitute a "custom or usage" with the force of law. *Id.* at 1343. To establish a policy or custom, it is generally necessary to show a persistent and widespread practice. *Depew v. City of St. Marys, Georgia*, 787 F.2d 1496, 1499 (11th Cir. 1986). Moreover, actual or constructive knowledge of such customs must be attributed to the governing body of the municipality. *Id.*

Thus, municipal liability may be based upon (1) an action taken or policy made by an official responsible for making final policy in that area of the city's business; or (2) a practice or custom that is so pervasive as to be the functional equivalent of a policy adopted by the final policymaker. *Id.*

**III.   Application**

The Defendants do not challenge Tucker's personal qualifications, or the first four opinions that he intends to offer at trial. Instead, they challenge his fifth and sixth opinions:

> 5.      Since no disciplinary action was taken against Deputy Charles Fagan, or any other Seminole County deputy, for the improper stopping, detention, arrest and search of Darrell Young, Emerald McNeil, their son, and their vehicle, it appears that a custom and practice exists in the Seminole County Sheriff's Office that violations of the law will be ignored.
>
> Deputy Fagan has not been disciplined by the Seminole County Sheriff's office (see Fagan deposition page 9, line 25).
>
> This custom and practice demonstrates a deliberate indifference to the rights of citizens that deputies of the Seminole County Sheriff's Office will come into contact with in the performance of their duties.
>
> 6.      Because no process is in place at the Seminole County Sheriff's Office to audit the actions of deputies regarding the ratio of blacks that are stopped for traffic violations as opposed to whites, it appears that a custom and practice exists in the Seminole County Sheriff's Office to ignore racial profiling by its employees.

> Even though Young was identified as a black male on the Courtesy Ticket he was issued by Deputy Fagan, and anytime a traffic ticket is issued the race of the person ticketed is recorded, the Seminole County Sheriff's Office does not determine how many blacks were stopped, what they were stopped for, or how many whites were stopped and what they were stopped for (see Fagan deposition page 14, lines 2-14).
>
> At the time Darrell Young was stopped by Deputy Fagan the protocol recognized by the law enforcement profession nationally and in Florida was to record the race of the individual, the basis for the stop, and to audit, on a regular basis, to insure employees of the organization are not engaged in biased policing.
>
> The failure to have a process in place to audit policing practices to insure biased policing (racial profiling) does not occur, demonstrates a deliberate indifference to the rights of citizens that deputies from the Seminole County Sheriff's Office will come into contact with in the performance of their duties.

(Doc. 58-2 at 8-9) (deposition citations in original).

Although Tucker generally states that all of his opinions are based upon his "education, training, experience and knowledge of law enforcement standards, analysis and study in the field, through consulting professional literature, through seminars, the facts of the case presented, and the materials reviewed" (Doc. 58-2 at 3), he does not specify any particular basis for his fifth and sixth opinions.  Compare this to, for example, his first opinion, in which he describes training that police offers generally receive in regard to motor vehicle stops and, in support, cites to a "Concepts and Issues Paper" on the topic from the International Association of Chiefs of Police, National Law Enforcement Policy Center.  (Doc. 58-2 at 4).

The Defendants argue that opinion five lacks a logical basis.  (Doc. 58 at 6).  The Court agrees.  Tucker offers nothing but speculation that the Sheriff's Office has a custom of failing to punish its deputies.  The Plaintiffs attempt to support Tucker's fifth opinion by noting that certain officers, when deposed, were unaware of any other officers having been punished for traffic stop violations.  (Doc. 60 at 4-5).  Obviously, evidence that two officers were not aware of other officers

having been punished falls far short of evidence that the Sheriff's Office had a *custom* of not punishing officers.  And the Plaintiffs offer nothing else on this point.  For example, they have not cited a single incident predating the stop at issue in this suit in which officers even arguably deserved punishment and did not receive it.

Tucker's sixth opinion suffers from similar shortcomings.  Tucker contends that because the Defendants lack a system for auditing the racial breakdown of their traffic stops, a custom exists in the Seminole County Sheriff's Office to ignore racial profiling by its employees.  (Doc. 58 at 2).  Despite being challenged by the Defendants, the Plaintiffs offer no basis for his contention that the Sheriff's Office is ignoring racial profiling.  They do not cite any incidents of racial profiling that predate the stop at issue in this suit.  They do not point to any evidence that the Sheriff's Office was even allegedly made aware that racial profiling was going on prior to the events at issue in this suit.  They do not cite to any evidence that a failure to audit traffic stops results in racially biased traffic stops.  Instead, Tucker simply assumes one of the things which the Plaintiffs must prove to establish municipal liability on their equal protection claim – that Seminole County officers have a custom of engaging in racial profiling.

**IV.     Conclusion**

The Plaintiffs have failed to show that either Tucker's fifth opinion or his sixth opinion are based on sufficient facts or data to warrant admission under Rule 702.  Therefore, the Defendants' Motion to Partially Exclude Testimony of Plaintiffs' Expert Melvin L. Tucker (Doc. 58) is **GRANTED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on September 28, 2006.

                                                  GREGORY A. PRESNELL
                                            UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party