# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**DARRELL J. YOUNG,**
**EMERALD McNEIL,**

<b>Plaintiffs,</b>

**-vs-**                                                    Case No.  6:04-cv-1830-Orl-31KRS

**SEMINOLE COUNTY SHERIFF DONALD**
**F. ESLINGER, and DEPUTY SHERIFF**
**OFFICERS CHARLES B. FAGAN,**
**WYTOSIA WILEY, JEFFREY WILBUR,**
**RAY BRONSON, & JEFF DUNCAN**
<b>Defendants.</b>

_____

# ORDER

This matter comes before the Court on the Defendant Sheriff's Motion for Summary

Judgment (Doc. 55) and the Plaintiffs' response (Doc. 63).

## I.      Background

The Plaintiffs, individually and as the guardians of Da'Mond Young, a minor, contend that

their civil rights were violated during an August 2001 traffic stop conducted by members of the

Seminole County Sheriff's Office (the "Sheriff's Office").  (Doc. 38 at 5).  More specifically, they

contend that while driving through Seminole County, they were pulled over without probable

cause.  (Doc. 38 at 6).  Deputies searched their car and their persons over the course of the next

two and a half hours, even employing a canine unit, but no drugs or contraband were found.  (Doc.

38 at 6-7).

They have filed a seven-count complaint alleging false arrest/imprisonment against

Defendant Sheriff Donald F. Eslinger ("Eslinger" or "the Sheriff") (Count I); violation of right to

privacy against the Sheriff (Count II);[1] invasion of privacy against the Sheriff (Count III); invasion of privacy against Defendant Deputy Sheriff Charles B. Fagan ("Fagan") and Defendant Deputy Sheriff Jeffrey Wilbur ("Wilbur") (Count IV); intentional infliction of emotional distress against Fagan, Wilbur, and Defendant Deputy Sheriff Wytosia Wiley ("Wiley") (Count V); violation of 42 U.S.C. § 1983 against the Sheriff (Count VI); and violation of 42 U.S.C. § 1983 against Fagan, Wilbur, Defendant Deputy Sheriff Ray Bronson ("Bronson"), and Defendant Deputy Sheriff Jeff Duncan ("Duncan") (Count VII).  (Doc. 38).  Melvin L. Tucker ("Tucker"), a retired police chief and FBI agent, has been retained by the Plaintiffs to offer an expert opinion on the police practices at issue in the instant case.  (Doc. 58-2).

Eslinger moves for summary judgment as to Counts I, III, and VI.  (Doc. 55 at 1).  As to each count, Eslinger has been sued in his official capacity as Sheriff of Seminole County.  (Doc. 38 at 1).

## II.   Standards

### A.   Local government liability under Section 1983

A suit against a public official in his official capacity is, in all respects other than name, treated as a suit against the local government entity he represents. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).  A local government is liable under 42 U.S.C. § 1983 for its policies that cause constitutional torts.  *McMillan v. Monroe County, Ala.*, 520 U.S. 781, 785 (1997).  Local government liability under Section 1983 cannot be based solely on the theory of *respondeat*

---

[1]Count II was dismissed with prejudice on March 9, 2005.  (Doc. 30).  Although the Plaintiffs included it in their Amended Complaint, which was filed after that dismissal, they stated that they were not attempting to reallege that claim.  (Doc. 38 at 9 n.1).

*superior*.  *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994).  To establish government liability in a Section 1983 case, plaintiffs must show that action pursuant to official governmental policy of some nature caused a constitutional tort.  *Id*.  Only those governmental officers who have final policymaking authority may by their actions subject the government to Section 1983 liability.  *Id.*  However, liability will also attach for constitutional deprivations visited pursuant to governmental custom even though such a custom has not received formal approval through official decisionmaking channels.  *Id.* at 1342-43.  Although not authorized by written law, such practices of governmental officials can be so permanent and well settled as to constitute a "custom or usage" with the force of law.  *Id.* at 1343.  To establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice.  *Depew v. City of St. Marys, Georgia*, 787 F.2d 1496, 1499 (11th Cir. 1986).  Moreover, actual or constructive knowledge of such customs must be attributed to the governing body of the governmental entity.  *Id.*

Thus, governmental liability may be based upon (1) an action taken or policy made by an official responsible for making final policy in that area of the governmental entity's business; or (2) a practice or custom that is so pervasive as to be the functional equivalent of a policy adopted by the final policymaker.  *Id.*

   **B.**      **Summary Judgment**

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

## III.     Application

### A.     Count I – False Arrest/Imprisonment

Citing to the Motion for Summary Judgment (Doc. 56) filed by the other defendants, Eslinger contends that probable cause existed to stop and detain the Plaintiffs.  (Doc. 55 at 8). Probable cause is a complete bar to an action under Florida law for false arrest or false imprisonment. *Bolanos v. Metropolitan Dade County*, 677 So.2d 1005 (Fla. 3d DCA 1996). However, as more fully described in this Court's accompanying order on the other defendants'

motion, the facts underlying the issue of probable cause are disputed.  The existence of a genuine

issue of material fact as to probable cause for the stop precludes a grant of summary judgment in

the Sheriff's favor on the false arrest count.

### B.    Count III – Invasion of Privacy

In Count III, the Plaintiffs complain that the Sheriff, through his employees, searched the

Plaintiffs and their vehicle without consent or probable cause, including a search of their son's

diaper and up the skirt of Plaintiff McNeil.  (Doc. 38 at 12).  The Plaintiffs contend that these

actions violated their common law right to be free from invasions into their privacy.  (Doc. 38 at

11).

The Florida Supreme Court first recognized the common law tort for invasion of privacy in

*Cason v. Baskin*, 20 So. 2d 243 (Fla. 1945).  Florida recognizes four categories of wrongful

conduct that may be remedied by resort to an invasion of privacy action:

> (1) appropriation - the unauthorized use of a person's name or likeness to obtain
> some benefit; (2) intrusion - physically or electronically intruding into one's
> private quarters; (3) public disclosure of private facts - the dissemination of
> truthful private information which a reasonable person would find objectionable;
> and (4) false light in the public eye - publication of facts which place a person in a
> false light even though the facts themselves may not be defamatory.

*Agency for Health Care Admin. v. Associated Industries of Florida, Inc.*, 678 So. 2d 1239, 1252

n.20 (Fla. 1996).  The Sheriff contends that the allegations in Count III do not fall into one of those

four categories.  (Doc. 55 at 8-9).  The Plaintiffs respond, in effect, that they have alleged that the

Defendants intruded into what should be considered the Plaintiffs' "private quarters" – their car,

their child's diaper, and Plaintiff McNeil's dress.  (Doc. 63 at 14).

In *Allstate Ins. Co. v. Ginsberg*, 863 So.2d 156 (Fla. 2003), a sexual harassment case, the Florida Supreme Court rejected the argument that the "intrusion" category of the invasion of privacy tort was broad enough to encompass "unwelcome conduct including touching in a sexual manner and sexually offensive comments." *Id.* at 162. The Court held that the "intrusion" encompassed by that tort "refers to a 'place' in which there is a reasonable expectation of privacy and is not referring to a body part." The *Ginsberg* court continued:

> As we noted at the time we first recognized this tort in *Cason*, the tort of invasion of privacy was not intended to be duplicative of some other tort. Rather, this is a tort in which the focus is the right of a private person to be free from public gaze.

*Id.*

It is clear that the conduct described in Count III, even if wrongful, is not the sort of conduct that constitutes an invasion of privacy under Florida law. There is no suggestion that the Plaintiffs were held up to the public gaze, and it is clear that public exposure has nothing to do with the harm that they allegedly suffered. Moreover, the Plaintiffs' complaints regarding the searching of the child's diaper and McNeil's dress are foreclosed by *Ginsburg*.[2]

---

[2]The Plaintiffs cite a number of cases that are claimed to stand for the proposition that "unwarranted touching can constitute an invasion of privacy even in claims relating to law enforcement officers." (Doc. 63 at 13-14). The Plaintiffs are mistaken. The first such case, *Hennagan v. Department of Highway Safety and Motor Vehicles*, 467 So. 2d 748 (Fla. 1st DCA 1985), considered only whether a law enforcement officer who committed a sexual assault could be considered to have been acting within the scope of his employment. The question of whether such an assault might constitute an invasion of privacy was not addressed. *Stoddard v. Wohlfahrt*, 573 So. 2d 1060 (Fla. 5th DCA 1991) involved harassing phone calls, not touching, and did not involve a law enforcement officer. *Stockette v. Tolin*, 791 F.Supp. 1536 (S.D.Fla. 1992), a sexual harassment case, involved a male employer who, *inter alia*, invaded a female employee's privacy by intentionally barging in on her in the ladies' bathroom.

###### C.      Count VI - Section 1983

The Plaintiffs' Section 1983 allegations against the Sheriff fall into two areas.  First, the Plaintiffs allege that the Sheriff's Office "has a policy, custom, and practice in place where African Americans are stopped when they meet a profile and/or are coming from a location the SCSO perceives as a drug area.  These persons, like Plaintiffs, are stopped without probable cause and illegally detained and searched."  (Doc. 38 at 17).  Second, the Plaintiffs allege that the Defendants Fagan, Wiley, and Wilbur – as well as unnamed "others" – "had improper training or inadequate training" as to the constitutional requirements for searches and seizures.  (Doc. 38 at 17). According to the Plaintiffs, these policies were the "driving force" behind their stop.  (Doc. 38 at 17).

Eslinger raises a number of defenses to both the Equal Protection and the Fourth Amendment violations alleged in Count VI.  Eslinger notes that racial profiling is officially banned by the Sheriff's Office, and was at the time the Plaintiffs were pulled over.  (Doc. 55 at 5).  He contends that the Plaintiffs have failed to present evidence of any other incidents similar to that alleged in the Second Amended Complaint, and have not presented any evidence that the Sheriff allows his employees to engage in profiling.  (Doc. 55 at 5).  He argues that, as demonstrated in the motion for summary judgment filed by the deputies, the Plaintiffs did not suffer any constitutional violation during their stop, and therefore there is nothing for which the Sheriff's office might be held responsible.  (Doc. 55 at 5).  He also alleges that the Plaintiffs have not presented any evidence that racial profiling occurs in his department – for example, evidence that African Americans have been treated differently than members of other races under similar circumstances.  (Doc. 55 at 6).

In their response, the Plaintiffs raise a host of irrelevant issues.  They argue that the training of the Sheriff's Office's canine units was deficient.  (Doc. 63 at 7-9).  But the Plaintiffs did not make any allegations regarding the canine units or their alleged lack of training in Count VI.  They repeatedly complain about the failure of the Sheriff's Office to keep track of certain statistics, such as the racial breakdown of individuals pulled over for traffic stops.  (Doc. 63 at 6).  But the Plaintiffs offer no argument that the Sheriff's Office is legally required to keep such information, or that a factfinder can draw a negative inference from its failure to do so.  And the Plaintiffs go on at length about the mistreatment they allegedly received during the traffic stop at issue, arguing that it is so obviously egregious that the Sheriff's subsequent failure to punish the other defendants shows that such mistreatment was a policy or custom of the Sheriff's Office.  (Doc. 63 at 8-9).  It may be that, under certain circumstances, a policymaker's after-the-fact failure to punish may suggest that his or her employees were acting pursuant to a policy or custom.  *See*, *e.g.*, *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 171 (5th Cir. 1985) (in case where police officers gunned down innocent passerby, holding city responsible under Section 1983 because "[t]he evidence does prove repeated acts of abuse on this night, by several officers in several episodes, tending to prove a disposition to disregard human life and safety so prevalent as to be police policy or custom.  The entire six officers of the night shift of the City of Borger participated in this wild barrage, when the exercise of the least care and the use of any rational and organized plan would have avoided the death of James Grandstaff."). But nothing in the record suggests that the deputies' (alleged) wrongdoing during this traffic stop was so extraordinarily egregious and widespread that the Sheriff's refusal to reprimand them can be considered evidence of a policy or custom of such

wrongdoing.  *See*, *e.g.*, *Snyder v. Trepagnier*, 142 F.3d 791, 797-798 (5th Cir. 1998) (noting that *Grandstaff* analysis can only be applied to "extreme factual situations").

Citing the testimony of Lt. William Morris ("Morris"), the head of training for the Sheriff's Office, the Plaintiffs point out that the Defendants did not offer or receive training in regard to racial profiling prior to the time the Plaintiffs were stopped.  (Doc. 63 at 5-6).  But the Plaintiffs fail to present any evidence, such as prior instances of race-based stops, indicating that the Sheriff's Office knew or should have known that such training was needed.[3]

With regard to the Fourth Amendment issues, the Plaintiffs misrepresent the record.  They assert that Morris testified that the individual Defendants "do not receive any formal training on the Fourth Amendment to the United States Constitution" and that Morris was "unaware of any such training prior to the time of the incident in question."  (Doc. 63 at 6).  Morris actually testified that all officers receive Fourth Amendment training in the police academy and that the Sheriff's Office provides an informal field training program.  (Morris Depo. at 7-10).  Moreover, as was the case with regard to racial profiling, the Plaintiffs have failed to present any evidence that the Sheriff's Office knew or should have known that its officers had insufficient training as to the requirements of the Fourth Amendment.  In sum, the Plaintiffs have failed to produce any evidence that the Sheriff's Office had a policy or practice of racial profiling or violating the Fourth Amendment's requirements in regard to searches and seizures, much less that the Sheriff knew or should have known of such practices.  As such, the Sheriff is entitled to summary judgment on the Section 1983 claim.

---

[3]Despite its apparent relevance to these issues, in their response the Plaintiffs do not attempt to rely on the opinion testimony of Tucker, their police practices expert.

**IV.**     **Conclusion**

For the reasons stated above, the Defendant Sheriff's Motion for Summary Judgment (Doc. 55) is **GRANTED IN PART** and **DENIED IN PART**.  The motion is **GRANTED** as to Counts III and VI; as to Count I, the motion is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on September 29, 2006.

> **GREGORY A. PRESNELL**
> **UNITED STATES DISTRICT JUDGE**

Copies furnished to:

Counsel of Record
Unrepresented Party