**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

DARRELL J. YOUNG,
EMERALD McNEIL,

                  **Plaintiffs,**

-vs-                                                    Case No. 6:04-cv-1830-Orl-31KRS

SEMINOLE COUNTY SHERIFF DONALD
F. ESLINGER, and DEPUTY SHERIFF
OFFICERS' CHARLES B. FAGAN,
WYTOSIA WILEY, JEFFREY WILBUR,
RAY BRONSON, & JEFF DUNCAN
                  **Defendants.**

_____

# ORDER

This matter comes before the Court on the Motion for Summary Judgment filed by Defendants Fagan, Wiley, Wilbur, Bronson, and Duncan (Doc. 56) and the Plaintiffs' Response (Doc. 62).

**I.    Background**

The Plaintiffs, individually and as the guardians of Da'Mond Young, a minor, contend that their civil rights were violated during an August 10, 2001 traffic stop conducted by members of the Seminole County Sheriff's Office (the "Sheriff's Office"). (Doc. 38 at 5). More specifically, they contend that while driving through Seminole County, they were pulled over without probable cause. (Doc. 38 at 6). Deputies searched their car and their persons over the course of the next two and a half hours, even employing a canine unit, but no drugs or contraband were found. (Doc. 38 at 6-7). They have filed a seven-count complaint alleging false arrest/imprisonment against Defendant Sheriff Donald F. Eslinger ("Eslinger" or "the Sheriff") (Count I); violation of right to

privacy against the Sheriff (Count II);[1] invasion of privacy against the Sheriff (Count III); invasion of privacy against Defendant Deputy Sheriff Charles B. Fagan ("Fagan") and Defendant Deputy Sheriff Jeffrey Wilbur ("Wilbur") (Count IV); intentional infliction of emotional distress against Fagan, Wilbur, and Defendant Deputy Sheriff Wytosia Wiley ("Wiley") (Count V); violation of 42 U.S.C. § 1983 against the Sheriff (Count VI); and violation of 42 U.S.C. § 1983 against Fagan, Wilbur, Defendant Deputy Sheriff Ray Bronson ("Bronson"), and Defendant Deputy Sheriff Jeff Duncan ("Duncan") (Count VII).  (Doc. 38).  The instant motion addresses Counts IV, V, and VII.

## II.     Standards

### A.     Qualified Immunity

Qualified immunity shields a Section 1983 defendant from liability for harms arising from discretionary acts, as long as the discretionary acts do not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known.  *Wilson v. Jones*, 251 F.3d 1340, 1344 (11th Cir. 2001).  To receive qualified immunity, "the government official must first prove that he was acting within [the scope of] his discretionary authority." *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003).  Once the official establishes that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiffs to show that qualified immunity is not appropriate.  *Id*.  To determine whether qualified immunity is appropriate, the Court must ask two questions.  First, whether, viewed in the "light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a

---

[1] Count II was dismissed with prejudice on March 9, 2005.  (Doc. 30).  Although the Plaintiffs included it in their Amended Complaint, which was filed after that dismissal, they stated that they were not attempting to reallege that claim.  (Doc. 38 at 9 n.1).

-2-

constitutional right?" *Id*. (internal citation and quotation omitted). Second, if a violation of a right can be made out based on the facts alleged, the Court must determine whether that right was clearly established. *Id*. In making these determinations, the Court accepts "all well-pleaded facts in the complaint as true and draw[s] all inferences in the plaintiff's favor." *Williams v. Ala. State Univ.*, 102 F.3d 1179, 1182 (11th Cir. 1997); *see also O'Rourke v. Hayes*, 378 F.3d 1201, 1206 (11th Cir. 2004) (the Court "look[s] to the pleadings to see if the plaintiff has successfully alleged the violation of a clearly established right.").

The determination of whether a constitutional right was clearly established at the time of the incident must be made in the specific context of the case. *Vinyard v. Wilson*, 311 F.3d 1340, 1349 (11th Cir. 2002). "A right is clearly established if, in light of preexisting law, the unlawfulness of the official's conduct is 'apparent'." *Cooper v. Dillon*, 403 F.3d 1208, 1220 (11th Cir. 2005); *Vinyard*, 311 F.3d at 1350 (issue is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."). This standard does not require that the particular conduct under scrutiny was previously found to be unlawful. *Cooper*, 403 F.3d at 1220. Instead, the state of the existing law must only be such that the official had a fair warning that his conduct is unlawful. *Id*. *See also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful."). General statements of the law are not inherently incapable of giving fair and clear warning, and in some instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the

specific conduct in question, even though the very action in question has [not] previously been held unlawful. *Hope v. Pelzer*, 536 U.S. 730,. 741 (2002) (internal quotation omitted).

The Eleventh Circuit has identified three categories of "fair and clear" warning:

> First, we look to see whether the federal statute or constitutional provision is so clear, and the conduct is so bad, that it precludes qualified immunity even in the total absence of case law. Second, if the conduct is not bad enough that it violates a constitutional provision on its face, we look to case law that can be applied broadly to a number of factual situations. Third, and finally, if no broad case law is applicable, we turn to case law precedent that is tied to the facts.

*Kesinger v. Herrington*, 381 F.3d 1243, 1250 n.6 (11th Cir. 2004) (internal citations omitted).

**B.     Summary Judgment**

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25. The party opposing a motion for summary judgment must rely on more than conclusory statements

or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255.  The Court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

**III.   Application**

In their Statement of Facts in Support of Motion for Summary Judgment (Doc. 57), Defendants Fagan, Wiley, Wilbur, Bronson, and Duncan make the following assertions as to the events of August 10, 2001:  The Sheriff's Office had been conducting an investigation of a suspected cocaine dealer, Earl Jack Williams ("Williams"), for more than a year.  (Doc. 57 at 1). Around 9 a.m. on August 10, agents intercepted a call between Williams and an unknown male, indicating there would be a meeting at a gas station in Sanford.  (Doc. 57 at 2).  Defendant Bronson, who was supervising the investigation, moved agents to the gas station to observe what the officers suspected would be a drug deal between Williams and the unknown male.  (Doc. 57 at 2).

Defendant Duncan drove to the station, parked his car near the pumps, and observed Williams pull up to one of the pumps, followed by a green SUV pulling up to the same pump on its other side.  (Doc. 57 at 2).  He then observed a black male getting out of the green SUV and going over to talk to Williams, who had exited his vehicle.  (Doc. 57 at 2).  Duncan contends he saw Williams place a small brown bag near a trash can and walk away from it, after which the

black male from the green SUV picked it up, re-entered his vehicle, and drove off.  (Doc. 57 at 2). Duncan notified Bronson of these events, and Bronson decided to stop the green SUV.  (Doc. 57 at 2).  Duncan contends that agents kept the green SUV in sight the entire time from when it left the gas station until it was pulled over.

      Defendant Fagan, who was waiting nearby in his vehicle, was directed to the vehicle driven by Plaintiff Young by an undercover agent, John Gowan ("Gowan"), who is not a party to this case and was not deposed during it.  (Doc. 57 at 5).  According to Fagan, Gowan also notified him that the vehicle to be pulled over contained a child who was not in a child restraint seat.  (Doc. 57 at 5). Fagan pulled the vehicle over, approached it, and notified the driver – Plaintiff Young – that he had been stopped for a child restraint violation.[2]  (Doc. 57 at 5-6).  According to Fagan, at the time he pulled the Plaintiffs over, he understood that he was pulling them over as part of a drug investigation rather than simply because of the child seat violation.  (Doc. 57 at 6).  Fagan estimates that pulling the Plaintiffs over, talking to them, running Young's license and registration, and receiving the results took about 10 minutes.  (Doc. 57 at 6-7).

      Deputy Wilbur, a canine handler, arrived approximately 15 minutes after the Plaintiffs had been pulled over.  (Doc. 57 at 7).  The deputies removed the Plaintiffs from their vehicle, and Wilbur used his drug detection dog, Spanky, to perform a sniff examination of the outside of the vehicle.  (Doc. 57 at 7-8).  Spanky alerted near the driver's side door by going into a sitting position.  (Doc. 57 at 8).  Wilbur and Fagan searched the vehicle extensively, but did not find any narcotics.  (Doc. 57 at 8).  A sniff examination of the inside of the vehicle by Spanky was also

---

[2]The Plaintiffs do not contest the Defendants' contention that their one-year-old son was not occupying a required child safety seat at the time they were pulled over.  (Young Depo. at 94).

-6-

fruitless. (Doc. 57 at 8). The deputies then decided to have Spanky perform a sniff examination near the Plaintiffs, but he did not alert. (Doc. 57 at 9). Deputy Fagan ultimately issued the Plaintiffs only a courtesy warning regarding the child seat violation, and concluded the stop, according to his records, at 10:27 a.m.[3] (Doc. 57 at 12).

### A.     Count IV – Invasion of Privacy against Fagan and Wilbur

In Count IV, the Plaintiffs complain that Fagan and Wilbur "searched the Plaintiffs and the Plaintiffs' vehicle without consent and without probable cause, including the search of the infant minor [child's] diaper" and that "[t]he canine unit also searched up the skirt of Plaintiff McNeil," causing the Plaintiffs to suffer damages. (Doc. 38 at 12). The Plaintiffs contend that these actions violated their common law right to be free from invasions into their privacy. (Doc. 38 at 12).

The Florida Supreme Court first recognized the common law tort for invasion of privacy in *Cason v. Baskin*, 20 So. 2d 243 (Fla. 1945). Florida recognizes four categories of wrongful conduct that may be remedied by resort to an invasion of privacy action:

> (1) appropriation - the unauthorized use of a person's name or likeness to obtain some benefit; (2) intrusion - physically or electronically intruding into one's private quarters; (3) public disclosure of private facts - the dissemination of truthful private information which a reasonable person would find objectionable; and (4) false light in the public eye - publication of facts which place a person in a false light even though the facts themselves may not be defamatory.

*Agency for Health Care Admin. v. Associated Industries of Florida, Inc.*, 678 So. 2d 1239, 1252 n.20 (Fla. 1996). Fagan and Wilbur contend that the allegations in Count IV do not fall into one of those four categories. (Doc. 56 at 19-20). The Plaintiffs respond, in effect, that they have alleged

---

[3]Plaintiff McNeill testified that the stop lasted from approximately 8:15 a.m. to approximately 10:57 a.m. (Doc. 57-7 at 42-43)

that the Defendants intruded into what should be considered the Plaintiffs' "private quarters" – their car, their child's diaper, and Plaintiff McNeil's dress. (Doc. 62 at 19-20).

In *Allstate Ins. Co. v. Ginsberg*, 863 So.2d 156 (Fla. 2003), a sexual harassment case, the Florida Supreme Court rejected the argument that the "intrusion" category of the invasion of privacy tort was broad enough to encompass "unwelcome conduct including touching in a sexual manner and sexually offensive comments." *Id.* at 162. The Court held that the "intrusion" encompassed by that tort "refers to a 'place' in which there is a reasonable expectation of privacy and is not referring to a body part." The *Ginsberg* court continued:

> As we noted at the time we first recognized this tort in *Cason*, the tort of invasion of privacy was not intended to be duplicative of some other tort. Rather, this is a tort in which the focus is the right of a private person to be free from public gaze.

*Id.*

It is clear that the conduct described in Count IV, even if wrongful, is not the sort of conduct that constitutes an invasion of privacy under Florida law. There is no suggestion that the Plaintiffs were held up to the public gaze, and it is clear that public exposure has nothing to do with the harm that they allegedly suffered. Moreover, the Plaintiffs' complaints regarding the searching of the child's diaper and McNeil's dress are foreclosed by *Ginsburg*.[4]

---

[4] The Plaintiffs cite a number of cases that are claimed to stand for the proposition that "unwarranted touching can constitute an invasion of privacy even in claims relating to law enforcement officers." (Doc. 63 at 13-14). The Plaintiffs are mistaken. The first such case, *Hennagan v. Department of Highway Safety and Motor Vehicles*, 467 So. 2d 748 (Fla. 1st DCA 1985), considered only whether a law enforcement officer who committed a sexual assault could be considered to have been acting within the scope of his employment. The question of whether such an assault might constitute an invasion of privacy was not addressed. *Stoddard v. Wohlfahrt*, 573 So. 2d 1060 (Fla. 5th DCA 1991) involved harassing phone calls, not touching, and did not involve a law enforcement officer. *Stockette v. Tolin*, 791 F.Supp. 1536 (S.D.Fla. 1992), a sexual harassment case, involved a male employer who, *inter alia*, invaded a female employee's privacy by intentionally barging in on her while she was in the restroom.

**B.     Count V – Intentional Infliction of Emotional Distress against Fagan, Wiley, and Wilbur**

To prove intentional infliction of emotional distress under Florida law, a plaintiff must prove: (1) deliberate or reckless infliction of mental suffering; (2) by outrageous conduct; (3) which conduct has caused the suffering; and (4) the suffering must have been severe. *Hart v. U.S.*, 894 F.2d 1539, 1548 (11th Cir. 1990). Outrageous conduct is conduct that is so "outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." *Metropolitan Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278-79 (Fla. 1985). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Id.* at 279. Liability for intentional infliction of emotional distress does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Scheller v. American Medical Intern., Inc.*, 502 So. 2d 1268, 1271 (Fla. 4th DCA 1987).

Count V consists of allegations that Fagan caused the Plaintiffs to be unduly detained and subjected to an illegal search and seizure, that Wiley (temporarily) took the Plaintiffs' child away from them, and that Wiley and Wilbur caused the Plaintiffs to believe that their child would be taken to the Department of Children and Family Services. (Doc. 38 at 14). In their response to the instant motion, the Plaintiffs recount additional allegations regarding the conduct of the Defendants during the stop: Young testified that one of the officers brandished a weapon at him, that the officers forced his infant son to remain outside on a hot day while he turned red and mosquitoes bit him, and that the officers removed his son's diaper so the canine could sniff his

rear end. (Doc. 62 at 16-18). As a matter of law, the allegations in Count V and those cited in the Plaintiffs' response to this motion, though more than trivial, do not rise to the level of outrageousness required to support a claim of intentional infliction of emotional distress. Fagan, Wiley, and Wilbur are entitled to summary judgment on this point.

### C. Count VII - Section 1983 against Fagan, Wilbur, Bronson, and Duncan

There is no dispute that Fagan, Wilbur, Bronson, and Duncan were acting within the scope of their discretionary authority when they stopped the Plaintiffs on August 10, 2001. (Doc. 56 at 3). In defense of the Section 1983 claim, the Section 1983 Defendants offer two arguments: first, that there were no constitutional violations committed during the August 10, 2001 stop, and second, that even if constitutional violations were committed, they are entitled to qualified immunity because the constitutional rights at issue were not clearly established.[5] (Doc. 56 at 2-3).

#### 1. Fourth Amendment Claims

The Plaintiffs contend that their Fourth Amendment rights were violated because the deputies pulled them over without probable cause, searched them and their vehicle without probable cause, and continued their detention beyond a reasonable time. (Doc. 38 at 20). The Defendants who played a role in the initial stop – Bronson, who ordered it, and Fagan, who accomplished it – argue that Fagan had two different types of probable cause to pull the Plaintiffs

---

[5] The only Defendant who makes more than a perfunctory argument as to the second point is Wilbur, the canine deputy, who argues that the law was not clearly established as to whether a sniff search in the vicinity of a suspect in which the dog accidentally bumps into the suspect constitutes a search for Fourth Amendment purposes. (Doc. 56 at 15). The Plaintiffs' disagreement as to the extent of the canine's sniff search and how it was conducted precludes summary judgment on this point.

over: probable cause to believe they were violating Florida's child safety seat statute,[6] and probable cause to believe that one of the occupants of the vehicle had just received narcotics from Williams.[7] They further argue that Spanky's alerting at the driver's door of the Plaintiffs' vehicle gave them probable cause to search it. And finally, they argue that the duration of the stop – about 15 minutes from the initial stop until the canine unit arrived, and then another hour or so to perform the sniff searches and search the car – was reasonable as a matter of law.

The Plaintiffs do not dispute that probable cause to stop their vehicle would exist if they had been observed violating the child safety statute or participating in a drug deal. Rather, they point out that they dispute the Defendants' factual contentions: They deny having stopped at the gas station that morning and therefore argue that the Defendants could not have seen either of them participating in any drug deal with Williams. They also argue that the Defendants could not have seen up into their vehicle through tinted glass to see that their son, perched between them,

---

[6] Fla. Stat. § 316.613(1)(a) requires motor vehicle operators to place all children three years old or younger in a child restraint device. Fla. Stat. § 316.614 allows law enforcement officers to stop drivers suspected of violating the child safety seat statute. As a general matter, the decision to stop an automobile is reasonable within the meaning of the Fourth Amendment where the police have probable cause to believe that a traffic violation has occurred. *Whren v. U.S.*, 517 U.S. 806, 810 (1996). So long as such probable cause exists, the stop is not rendered unconstitutional by the fact that officers' actual motive for the stop is something (such as suspicion of drug trafficking) for which they otherwise lack probable cause to stop the vehicle. *Id.* at 813. "Subjective intentions have no role in ordinary, probable-cause Fourth Amendment analysis." *Id.*

[7] Fagan did not personally observe either the child seat violation or the alleged drug deal prior to stopping the Plaintiffs. Fagan contends that Gowan notified him about the former before the stop (Fagan Depo. at 31-32), and Duncan allegedly observed the latter (Duncan Depo. at 29). The "fellow officer rule," sometimes referred to as the "collective knowledge doctrine," permits the knowledge of other officers to be imputed to each member of an investigation for purposes of determining probable cause for a stop, even if the officer making the stop has not received all of the pertinent information before doing so. *Dewberry v. State*, 905 So. 2d 963, 967-68 (Fla. 5th DCA 2005).

was not in a child safety seat. Because these disputed issues of material fact exist as to the basis of the stop, the Defendants are not entitled to summary judgment on this point. Similarly, the Plaintiffs deny that the drug detection dog alerted at their vehicle, raising an issue of material fact that forecloses summary judgment as to the constitutionality of the subsequent search.

And finally, the Plaintiffs dispute the length of the stop, which they estimate (as noted above) at more than two hours. At this stage of the proceedings the Court cannot find, as a matter of law, that the stop was not extended beyond a constitutionally reasonable duration. Such a fact-intensive inquiry is inappropriate for disposition on summary judgment, at least where the facts are as contested as they have been in this case. *See*, *e.g.*, *U.S. v. Hernandez*, 418 F.3d 1206, (11th Cir. 2005) (finding that eight particular considerations – such as driver's implausible excuse for speeding, abnormal nervousness, and lack of knowledge of trip's destination – gave rise to reasonable suspicion that additional crime was being committed, making 17-minute detention between speeding-related stop and driver's consent to search for drugs constitutionally reasonable).

### 2. Equal Protection Claim

The Plaintiffs contend that they were pulled over because of their skin color, in violation of their right to Equal Protection under the Fourteenth Amendment to the United States Constitution. *See*, *e.g.*, *Whren* at 813 (stating that Equal Protection Clause, not Fourth Amendment, provides basis for challenge to racially discriminatory traffic stops). However, the Plaintiffs have failed to produce any evidence from which a reasonable factfinder could conclude that they had been treated differently on account of their race. *See Swint v. City of Wadley, Ala.*, 51 F.3d 988, 1000 (11th Cir. 1995) ("Absent some evidence of racially disproportionate arrests compared to the

actual incidence of violations by race, there is no basis for inferring racially selective law enforcement."). In fact, in their response (Doc. 62) to the instant motion, the Plaintiffs do not even attempt to offer an argument in support of their contention that they were treated differently on account of their race. The Defendants are therefore entitled to summary judgment on the Plaintiffs' equal protection claim under Section 1983.

## IV.  Conclusion

In consideration of the foregoing, it is hereby

**ORDERED** that the Motion for Summary Judgment filed by Defendants Fagan, Wiley, Wilbur, Bronson, and Duncan (Doc. 56) is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** as to Counts IV and V, and as to the equal protection claims in Count VII. In all other respects, the motion is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on September 29, 2006.

GREGORY A. PRESNELL<br>
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party